AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico  [▼]

**FILED**
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*
2008 DODGE RAM 1500 WITH VIN
#1D7HU18N08J153132 AND BEARING  NEW MEXICO
LICENSE PLATE RSR422

)
)
)
)
)
)

Case No. 24MR2343

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 841 | Distribution and possession with intent to distribute controlled substances |
| 21 USC § 846 | Conspiracy to distribute and possess with intent to distribute controlled substances |

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

BIA Special Agent Collin Pilcher
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: _December 24, 2024_

_____
*Judge's signature*

City and state: Albuquerque, NM

Laura Fashing, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: 2008 DODGE RAM 1500 WITH VIN #1D7HU18N08J153132 AND BEARING NEW MEXICO LICENSE PLATE RSR422 MORE FULLY DESCRIBED IN ATTACHMENT A. | 24MR2343<br>Case No. _____ |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Collin J. Pilcher, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      This affidavit is made in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search a 2008 Dodge Ram 1500 with a Vehicle Identification Number (hereinafter "VIN") of 1D7HU18N08J153132 and bearing state of New Mexico license plate RSR422 (hereinafter "TARGET VEHICLE"), which is located in the District of New Mexico and further described in Attachment A, for the things described in Attachment B for violations of 21 U.S.C. § 841, relating to the Possession with Intent to Distribute Heroin, a Controlled Substance.

2.      I am a Criminal Investigator with the Bureau of Indian Affairs (hereinafter "BIA"), Office of Justice Services (hereinafter "OJS"), Division of Drug Enforcement (hereinafter "DDE") and have been employed by the BIA since January 2014. I completed the Federal Law Enforcement Training Center Rural Police Officer Training Program Indian Police Academy in August 2014. I completed Department of Interior Investigator Training Program in June 2021. I graduated from the University of Phoenix with a bachelor's degree in criminal justice administration. My primary duty with the BIA is to investigate violations

of Title 18 and Title 21 of the United States Code which occur within the District of New Mexico, with a focus on violations in federal Indian Country.

3.      Over the course of my law enforcement career, I have investigated hundreds of individuals for a wide range of crimes.  My investigative experience includes, but is not limited to, conducting physical surveillance, interviewing subjects, victims, and witnesses, writing affidavits for and executing search and arrest warrants, supervising cooperating sources, issuing subpoenas, and conducting consensual monitoring.  I have received training and have experience in the investigation of violations of the federal drug laws, including the offenses listed below.  As a result, I am familiar with the methods and means used by individuals, drug trafficking organizations, and gang/criminal enterprises, to purchase, transport, store, and distribute controlled substances.  I am also familiar with how those individuals and organizations hide profits generated from their criminal activities and I have worked with and spoken to other law enforcement officers with expertise and experience in these areas.

4.      The statements in this affidavit are based on my own investigation as well as my experience, training and background as well as information I have received from other agents and law enforcement personnel based on their investigations as well as their experience, training, and background.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause for the requested warrant.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

5.    Your affiant believes there is probable cause that a known female has committed, is committing, and will continue to commit offenses involving violations of:

a.  21 USC § 841 – Distribution and possession with intent to distribute controlled substances

## EVIDENCE SOUGHT DURING THE SEARCH

6.    Based upon my training, experience and participation in this and in similar investigations, I know the information listed below.  I further know that individuals involved in illegal trafficking of controlled substances often conceal the below described evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles to which they have access, so that they have ready access to it and so that they can transport it, and hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses or conducting traffic stops.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

a.  Individuals involved in illegal drug trafficking often maintain quantities of controlled substances.

b.  Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.

Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

c.  Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

d.  Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

e.  The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical,

arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

f.  Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. There off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

g.  Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution

statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

h.  Drug traffickers usually sell their product for cash.  Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

i.  Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes, and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

j.  Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and

investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

k.  The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking.

Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

l.  Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs. They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

m.  Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

n.  I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

7.  Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents

Page 8 of 20

and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter- surveillance devices.

8.    Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

9.    Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax

returns, keys, deeds and mortgage receipts. These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

10.     A list of items agents seek authority to seize is in Attachment B.

### COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

11.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found in the TARGET VEHICLE, in whatever form they are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media. For this reason, I submit that if a computer, digital medium, or storage medium is found in the TARGET VEHICLE, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

12.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

13. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information

consistent with the warrant. The later review may require techniques, including but not limited to computer- assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## PROBABLE CAUSE

14.    On December 23, 2024, Sandoval County Sheriff's Office Deputy Sean Rodriguez was on duty.  Deputy Rodriguez is currently assigned as a K-9 Deputy in the K-9 Unit. Deputy Rodriguez was sitting stationary working traffic control. At about 16:05 hours, Deputy Rodriguez observed TARGET VEHICLE traveling northbound on Interstate 25 in the number one lane. Deputy Rodriguez pulled onto the interstate and observed the Dodge change lanes quickly.

15.    Deputy Rodriguez paced the vehicle for a short distance and observed it leave its lane of travel crossing the right fog line multiple times. Due to the driving behavior, Deputy Rodriguez initiated a traffic stop turning on his emergency overhead lights.

16.    Deputy Rodriguez could see the driver through the back window make a furtive movement reaching over to the vehicle's front passenger side and placing an unknown object down in front of him on the floorboard. The driver did move around inside the vehicle more than Deputy Rodrigeuz typically see during his traffic stops with the motoring public, which he found odd. The vehicle finally came to a stop near the 249.5-mile marker.

17.    Deputy Rodriguez exited his patrol vehicle and contacted the driver who was identified as Richard Ortega (hereinafter "Richard") who is also the registered owner of TARGET VEHICLE. Deputy Rodriguez advised Richard of the reason for the stop. Richard appeared

nervous to Deputy Rodriguez. Richard was speaking quickly and attempting to explain that he did have insurance on the vehicle. Richard provided his driver's license and an envelope which he stated the paperwork was inside. Deputy Rodriguez asked Richard to exit the vehicle and walk back to his patrol vehicle so Deputy Rodriguez could issue Richard his citations.

18. Deputy Rodriguez had Sandoval County Dispatch check Richard's driver's license number. Deputy Rodriguez then asked Richard if he would be willing to submit to Standardized Field Sobriety Tests due to the driving behavior Deputy Rodriguez observed. Richard agreed to submit to the testing.

19. During the testing, Richard appeared nervous to Deputy Rodriguez who could see that Richard was breathing heavily and sweating. The temperature outside was in the mid-50s. Richard did not show any signs of impairment during the testing.

20. Due to Richard's furtive movements when Deputy Rodriguez had initiated his traffic stop, the fact that he appeared to hide an unknown item inside the vehicle, and the nervous behavior he displayed during his interactions with Deputy Rodriguez, Deputy Rodriguez decided to deploy his assigned police dog Diesel on the vehicle for a free air sniff.

21. K-9 Diesel is a two-year-old German Shepherd. K-9 Diesel and Deputy Rodriguez have completed a dual-purpose narcotic detection and patrol K-9 handler course successfully on November 3, 2023. K-9 Diesel and Deputy Rodriguez received a nationally recognized certification for narcotics detection and patrol through the National Narcotic Detection Dog Association (NNDDA) on August 31, 2024. K-9 Diesel and Deputy Rodriguez also certified through the National Police Canine Association on February 20, 2024. K-9 Diesel

is trained in the detection of the odors of illegal controlled substances such as heroin, cocaine, methamphetamine, and fentanyl.

22.  Deputy Rodriguez placed K-9 Diesel in a pre-ritual down position and gave him the command to search for his trained odors.

    a.  Deputy Rodriguez observed K-9 Diesel's behavior change near the driver's side door, K-9 Diesel's breathing rate changed, and he attempted to climb up to the driver's side window, K-9 Diesel alerted at the bottom of the driver's side door seam.

    b.  K-9 Diesel showed another behavior change on the back passenger side between the truck bed and cab of the truck. K-9 Diesel crawled under the vehicle and Deputy Rodriguez could see that he had committed focus in the area. These behaviors are consistent with what Deputy Rodriguez sees during training and certifications when K-9 Diesel alerts to the presence of his trained odors.

23.  Deputy Rodriguez returned K-9 Diesel to his patrol vehicle and secured him in his holding cage. Deputy Rodriguez approached Richard and asked him if he would give Deputy Rodrigeuz consent to search the vehicle. Richard stated there was nothing going on in there, he just wanted to go home, and that Deputy Rodriguez could not search the vehicle. Deputy Rodriguez advised Richard at that time to call for a ride because Deputy Rodriguez was seizing the vehicle.

24.  While sealing the vehicle Deputy Rodriguez could smell the odor of vinegar, an odor which from his training and experience in the field is associated with heroin.

25.  Deputy Rodriguez also saw a pair of brass knuckles in plain view in the driver-side door pocket, from his training and experience in the field it is common for narcotic users and narcotic traffickers to arm themselves with weapons to protect themselves from being

robbed and to use against law enforcement to prevent apprehension. Deputy Rodriguez asked Richard if he was a convicted felon, and he stated yes. Deputy Rodrigez asked him how long ago his conviction was, and he stated in 2017 which was less than 10 years ago. Deputy Rodriguez removed the brass knuckles and secured them. Brass knuckles in the state of New Mexico are classified as a deadly weapon.

26.    Deputy Rodriguez detained Richard at that time for the investigation of felon in possession of a deadly weapon. Richard was placed into handcuffs. Deputy Rodriguez contacted the on-call detectives, who advised Deputy Rodriguez that the District Attorney's Office would likely not pick up that charge. Richard was taken out of handcuffs at that time.

27.    At that time Court Security Officer Brower, and Deputy Rodriguez completed sealing the vehicle and ensured it was locked.

28.    Deputy Rodriguez issued Richard two traffic citations. Richard did call for his mother to pick him up.

29.    The vehicle was towed to the Sandoval County Sheriff's Office where it was secured. Deputy Rodriguez notified Sandoval County Sheriff's Office Sargent Luke Osborn of the traffic stop and discussed the possible tribal enrollment status of Richard and the fact that the traffic stop concluded on the Pueblo of San Felipe Indian Reservation.

30.    Sgt. Osborn contacted BIA Special Agent Pilcher to further assist with the investigation.

## **CONCLUSION**

31.    Based on the information set forth above, there is probable cause to believe that items more fully described in Attachment B and consisting of evidence, contraband, instrumentalities and/or fruits of violations of 21 U.S.C. § 841, will be found at the location more fully described in Attachment A. Further, based upon the foregoing paragraphs, judicial

Page 15 of 20

Respectfully submitted,

Collin J. Pilcher
Special Agent
BIA OJS DDE

Electronically signed and telephonically sworn
on December 24, 2024:

UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

*Property to be searched*

The property to be searched is a red 2008 Dodge Ram 1500 with VIN # 1D7HU18N08J153132 bearing New Mexico license plate RSR422 (hereinafter "TARGET VEHICLE"). The TARGET VEHICLE was seized from registered owner Richard Ortega on December 23, 2024. The TARGET VEHICLE is currently located at the Sandoval County Sheriff's Office, 7255 Oersted RD NE, Bernalillo, NM 87004.

The search of the above the TARGET VEHICLE shall include the search of the entire vehicle, and all items contained in the TARGET VEHICLE including items where contraband could be concealed.

## ATTACHMENT B

*Property to be seized*

Evidence related to the unlawful distribution of and possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1), including:

1. Controlled substances, including heroin, cocaine, methamphetamine, and fentanyl.

2. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

3. Paraphernalia for packaging cash drug proceeds including heat sealing devices, plastic packaging for cash, rubber bands, and money-counting devices;

4. Books, records, receipts, notes, ledgers, designated codes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances;

5. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances;

6. Books, records, receipts, notes, ledgers, airline tickets, money orders, wire transfer or money remittance records, and other information related to the receipt, expenditure and concealment or other disposition of income;

7. Cash, currency, financial instruments, and records relating to drug-trafficking income and expenditures of proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug-trafficking activities;

8.      Photographs of individuals associated with the distribution of drugs, and of their property and their drugs;

9.      Records and information reflecting names, nicknames, addresses, and telephone numbers of both current and past drug associates;

10.     Safes, keys for safety-deposit boxes, hidden compartments and other secure locations, which often contain the proceeds of narcotics-trafficking activity, including, but not limited to, large amounts of United States currency;

11.     Canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents and keys;

12.     Records and information concerning occupancy or ownership of the VEHICLE (described in Attachment A), such as utility and telephone bills, mail envelopes, leases, or addressed correspondence.

13.     Seizure of cellular telephones;

14.     Seizure of computers, tablets and other electronic devices;

15.     Records and information depicting subscriber data and itemized telephone calls to other potential drug traffickers from residential telephone and cellular telephones;

16.     Records and information indicating ownership, association, and utilization of vehicles, to include maintenance and improvements to the vehicles.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

17.    Firearms and ammunition, including handguns, rifles, shotguns, and automatic weapons.